Good morning, Your Honor. Richard Sagerblum here on behalf of the appellants. I'd like to reserve five minutes of my time for a rebuttal. This is a discrimination case out of Reno involving both national origin and retaliation. My clients were two housekeepers that worked the graveyard shift at a hospital. They were assigned to clean the second floor of the hospital where the surgery section was. And while they were working, they were the only ones that would work. They were the only ones, excuse me? They were the only ones who were working on that floor on the graveyard shift. They were fired for allegedly sleeping during their lunch break. And the question is obviously whether they were fired because of their national origin or in retaliation. The incidents- Let me ask you first about retaliation. What is the alleged protected activity for which you claim retaliation? The protected activity in this case was one of the two women said when they were confronted about sleeping, the supervisor who confronted them said they had kind of an argument, and the one woman after he said I'm going to discipline you for this, she said I'm going to go to the head boss of the hospital and talk about this. She didn't say- So is that a protected activity to go up the chain of command to discuss a potential disciplinary action? Is that like making an EEOC complaint or being a witness for somebody in a discrimination case? Well, that alone would not be, but because one of these two women had previously made a discrimination complaint to the same man about the same supervisor, my argument is that there's an inference that when she said I'm going to go back to the same guy, that the supervisor realized that there was a discriminatory aspect to this, and this had happened after he had accused them of- he told them that he was going to fire them because they were speaking their native language, and that was the previous complaint that had been brought to the head man of the hospital, and that complaint had actually been torn up by the head man. So there was a history of discrimination. So to make sure that I'm following you, I have different terms in my notes. So the head guy is Olive, right? Right. Okay, and Mr. Peterson was the immediate supervisor? Right. So in response to Judge Graber's question, I want to make sure I understand your answer. The first complaint to Olive about Mr. Peterson was made six months earlier, and that was made by a different plaintiff than the one who made the complaint Judge Graber was just speaking of on the night of the termination. Right. But she said, we're going to go see Mr. Olive. Speaking of the night of the termination, she said, we're going to go see Mr. Olive, and that's what Mr. Peterson said in his memo that they said they were going to go. So it was basically the two of them acting together, even though only one of the women made the comment that she was going to go, and it was a different woman, you're right, than the one who complained around Christmas time. But they were both Filipino. This issue of being disciplined for speaking their dialect was what had occurred back in December. That's what Mr. Olive had done. He had torn up the discipline because of that. But it's not the case that after one of the plaintiffs asked to go see Mr. Olive a second time, that Mr. Peterson terminated her or took any action. He had already said, I'm going to write you up for sleeping, correct? Right. All right. Please go ahead. But then after that confrontation, then he sends an email to Olive saying, we just had this confrontation. I told them I was going to give them a verbal warning, but I also told them that if they went to you, they would probably get more serious discipline. Which they did. Right. But I guess my point is that in telling Mr. Olive, look, this issue came up, they were speaking Tagalog, their native language, they said they were going to come to you, and I told them if they came to you that they would get more serious discipline. He's basically telling Olive that's what's going to happen. Why would he even send an email if he knew that was the intent? I mean, if he anticipated that's what would happen, why would you send the email? And, in fact, my clients say that he said, I guarantee you if you go to Olive, you'll be terminated. Mr. Siegerblum, to the national origin discrimination claim, this case was analyzed under McDonnell-Douglas, which my understanding anyway is an alternative method for reviewing claims of discrimination where there is no direct evidence of discrimination. It seems to me you may have direct evidence of discrimination here in the comments made about Filipinos, which occurred close to the time when the women were fired. Why are we even discussing McDonnell-Douglas? Your Honor, I have to apologize. Reading this brief, it's been several years since we started this case, but reading it this week, I think to myself, why in the world did I just allege direct discrimination? But it's just, when they did their motion initially, it was done under McDonnell-Douglas, and I responded. Frankly, to me, even using McDonnell-Douglas, because of the Ninth Circuit precedent, with any direct evidence of discrimination, you would get a question of fact. It seemed like kind of a no-brainer, so to speak. So have you waived the direct evidence claim then? Well, that would be a decision for you. If I went back to the judge, to the district court for trial, I would certainly raise that. Whether that's been waived for purposes of appeal, I don't think that could be. I apologize for that. But it is, I mean, a very blatant comment by the decision-maker at the time. Well, that's a question, too, about who's the decision-maker here. The only animus shown, it seemed to me in this record, had to do with Mr. Peterson. There's nobody else who is alleged to have made derogatory comments towards your clients or other Filipinos. And it appears to me that he wasn't the moving force behind the decision ultimately made to terminate your clients. And so I wonder if you'd address that, because there has to be a connection between the alleged discrimination and the end result. Absolutely. First, the testimony was clear that the ultimate decision-maker was Mr. Peterson. The Director of Personnel even admitted that, and he said that in his testimony. I thought that was Bates who made that decision. Am I wrong about that? No, she says in her deposition that the ultimate decision-maker was Peterson. Well, she also said I didn't really leave him much choice. The e-mail chain where she was saying, what, why didn't you fire them, they need to be fired today, right, kind of thing. I guess I just want to be clear, and I'm not trying to be pejorative, but the e-mail's traffic is pretty telling that the head of HR, was that Bates? Right. I'm not indicating these people need to be terminated, but the way I read that record is that Mr. Peterson was the guy who had to deliver the bad news. But if I'm missing something, please. Well, no, but again, he says, I'm going to give you a verbal warning. They say, we're going to go see Mr. Olive. He then sends an e-mail to Olive and Bates saying, basically, I told them if they do this, they're going to be terminated. So if he wants to give a verbal notice, why would he even send the e-mail? I mean, by sending the e-mail, he sets in a chain where they immediately respond, they being Olive and Bates saying, oh, we have to terminate. I don't understand your answer. I'm not sure. I guess I have the same issue that maybe Judge Kristen was referring to, because Bates says in the deposition, ultimately, it's always the manager's final decision, but I didn't leave Pete much choice in this matter. Same with Alan Olive. So it seems to me that the people making this decision were not Mr. Peterson. Well, but again, they're basing it on what Mr. Peterson is telling them. Which was, I thought, corroborated. Well, he's telling them, look, I found them sleeping on the job, and I'm going to give a verbal warning. But if he says I'm going to give you a verbal warning and leaves, then that's the decision maker. But if he sends a memo to the head of personnel saying something worse is going to happen, by sending that, he's basically making sure it happens. So he is the decision maker in that regard. I mean, if he hadn't sent the e-mail, they wouldn't have been fired. So if he knows they're going to be fired if he sends the e-mail, and he sends the e-mail, then I don't see how you can take him out of that process. What about the person who was with Mr. Peterson who also sent an e-mail reporting the same incident? Mr. Pilley or Pilley? He was an independent person, and he did send an e-mail confirming it. And we didn't depose him. Well, I guess the point of these questions to me is there seems to be no factual question that they were, in fact, sleeping. That's absolutely wrong. This is their break, number one. They're in a room. They have the door blocked because she's giving herself insulin injections. The lights were turned out. They were watching TV. But whether they were sleeping or not, no one could tell because you couldn't see in there. Now, my point is if you're not being paid and it's your lunch break, if you want to sleep, you're entitled to sleep. They can't tell you what you do on your lunch break. Well, are you saying that there wasn't a rule against sleeping? There's no rule. Now, the management says you can't sleep, but they also, the rules say that, you know. Aren't they entitled to enforce it? Well, under the Fair Labor Standards Act, they aren't. Because if you're not being paid, you cannot dictate what you do during that period of time. Now, that's, again, not part of the record. But their own rules say basically we won't tell you what to do, we can't call on you during that period of time. So whether you're sitting there with your eyes closed or not. Well, it's not quite true that they can't control it. Well, let's say they say, you know, don't make a lot of noise and disturb people, for example, even though we're not paying you. It seems to me there are permissible rules of conduct. So I'm not really sure. I don't disagree. You couldn't go in there and have a party because you'd be disturbing things. But the flip side is you couldn't sit there with your eyes closed for 30 minutes, and they couldn't fire you because you were eyes closed whether you were sleeping or just had your eyes closed. Counsel, wasn't this an, am I wrong? Was this an assisted living facility? No, it's a hospital. This is the surgery suite on the second floor. Forgive me. This is what happens when there's a lot of cases in one week. I don't know how you keep them all in order, frankly. Well, I just goofed, to answer your question. But be that as it may, my understanding is that they needed to be available to respond to an emergency, I guess in a hospital facility as opposed to an assisted living facility. But am I misremembering that? Or was the rule that they needed to be sort of on call available? No. There was nothing about on call. I mean, obviously if they were there and the place caught on fire, they could be called. But what the rule says, if you're called, then you have to get . . . you're put on the clock. They were never paid for this 30-minute time period. Sure. But it does seem to me to be a difference, going back to Judge Graber's point, to say, you know, if we call you, yes, of course we have to start paying you. And to say your shift starts at hour X and ends at hour Y, and you're going to be given X number of breaks during that time, certainly. But I don't know why that necessarily answers the question about whether they couldn't say to their folks, you know, don't sleep on the job, especially given that it's a hospital. We need to be able to have you respond if there's an emergency. Well, if they were nurses, perhaps. These are housekeepers on the surgery floor where there's no surgeries going on, nothing. I mean, they just go in and clean the surgical suites at nighttime. Okay. Was there any argument by the defendants on that point below? Was that contested? No. And I'm not denying that that was the hospital policy, but there's nothing in the writing. That was just what they said. But, again, they could not tell they were sleeping. They thought they were sleeping, but when he knocked on the door, they started talking to each other in this dialect, and he screamed, you know, that's a terminable offense right there, which obviously their own policy says you can talk in your language during a break. If it's not in front of patients. Right. There was no patients. You may save that for rebuttal if you'd like. May it please the Court. Good morning, Dora Lane. I'm from Holland and Hart on behalf of Renown Health. I'd like to start by addressing some of the things that Mr. Segelbaum represented to the Court because I don't believe they're quite accurate with what the record reflects. First, to the protected activity question that was asked earlier, I believe Ms. Brock's testimony was that she said we should all go and see Al and Olive. So to the extent that the term we was referenced, that could also be interpreted to mean we as in the entire group, which included Mr. Peterson, Al and Pilly, who was there with Mr. Peterson at that time, and the two housekeeping employees. And I believe the question was well taken, how that constitutes protected activity. It doesn't. There is absolutely no evidence that harassment or, in fact, they admitted no harassment or discrimination was mentioned on the night in question on June 13th. There's also no evidence that Ms. Brock, who was the employee who suggested they all go to Olive, was in any way following up on the prior complaint by Ms. Saranda. Ms. Saranda's prior complaint to Mr. Olive in January of 07, five, six months prior, in no way referenced Ms. Brock. So there's simply no connection between those two events. And they certainly haven't presented admissible evidence to that effect. I want to address Judge Tonheim's, I apologize, question about why are we talking about the McDonnell-Douglas analysis. We actually, in our motion for summary judgment, the initial brief, we did argue that discrimination could be established in one of two ways, either through direct evidence or through the McDonnell-Douglas presumption. In response, that the direct evidence way to establish a prima facie case was never addressed, which is why the case proceeded under the McDonnell-Douglas framework, which is why I would argue that that argument is being waived. But even if it isn't waived, and let's assume that there's a prima facie case, there's certainly a legitimate nondiscriminatory reason that's stated, and then we would look at whether there's evidence of pretext that's sufficient to withstand. And I'm not sure ultimately whether it makes very much practical difference whether we're looking at step three or step one. Fair enough, Your Honor. I just wanted to clarify the issue. I believe Mr. Segelborn stated that we, in our initial briefing, had not even gone the route of there's a way to establish a prima facie case through direct evidence. Be that as it may, I completely agree, because one has to look, even if we use this in the first part of the test as opposed to the pretext part, one has to look at that direct evidence in terms of the entirety of the context in which it was made. And in this particular case, there is very clear evidence that the employers believed that the two employees were sleeping was very reasonable, based on their own admissions that they had blocked the door, that the lights were out, no sound came from the room, etc., etc. I would also point out that the email to which Mr. Segelborn points is the alleged evidence of discrimination that's supposedly set in motion in the process, can all be used for that purpose. Because number one, Alan Peely, the hospital coordinator who was with him that night, sent an email independently reporting essentially the same events. There's absolutely no evidence that the decision by Bates and Olive to essentially mandate the termination of the two housekeepers rested on Mr. Peterson's email, but not on Mr. Peely's email. And there's no admissible evidence that Mr. Peely harbored any feelings of discrimination. I would also like to invite the court's attention to what Mr. Peterson's email actually says. Number one, he says, I was going to give them verbal warnings. And that never changed, even after the alleged comment, I hate Filipinos, I'm sick and tired of Filipinos. And it's also interesting to note the language which he used. He talks about the blocking of the door being a safety violation. I'm sorry, I believe it is ER-408. So his email indicating that he wanted to give them a warning can erase the comments, which we have to accept as true for purposes of a summary judgment motion, correct? No, absolutely not, Your Honor. I'm not arguing that those comments should be disregarded. They clearly have to be accepted as true. My argument is that even if we accept those comments as true, reading the entire context of what transpired that night, and the email, and everything else about Mr. Peterson's hiring statistics and termination statistics, all of that does not amount to enough evidence to reverse the grant of summary judgment. The email specifically, I'm sorry, did I answer your question? No. Specifically, the email that Mr. Peterson said talks about the blocking of the door was a safety violation and is not to be done again. This is clear evidence that he intended for these employees to remain employed. He, in fact, sent them back to work. Ms. Brock testified she didn't think they were going to be terminated. Then . . . So who is the decision maker? The decision maker was ultimately, finally, Pete Peterson. However, as Judge . . . I'm sorry, I'm blanking. Us guys. Diane Bates and Ellen Olive did not leave much choice in the matter. They essentially mandated that's what happened. And he knew he could not make that decision by himself. He had to check with HR. HR told them that's what they needed to do, and that's what he did. But he's still the decision maker, in your view? Yes, he is, but in this particular instance, the decision was made for him. In a sense, I think your argument is that he's the decision maker, but the cause, the undisputed, in your view, cause is the directive of Olive and Bates, not his own underlying feelings about these employees, whatever they may be. That's absolutely correct, Your Honor. And the language to which Mr. Segerblom pointed as far as Pete Peterson told them what to do, the punishment will be more severe, that has to be read in the context of the very follow-up sentence. I did not tell them that there had been prior reports about them being found sleeping on duty and that Allen reported the same thing a couple of weeks ago. Is Allen Mr. Pilley? Yes, I'm sorry. So Pete Peterson testified in his deposition that, yes, he was afraid that if things got out of his hands, which is where they would have stayed had the verbal warning been allowed to stand and they not gone to Olive, they being the two housekeeping employees, then he would have had that power and that control to make the final decision to allow them to continue working and issue the verbal warnings. However, his fear was in light of these prior reports, if the matter went to Diane Bates and to Allen Olive, especially in light of what everybody had witnessed that night, this was going to be out of his hands and it would result in more serious punishment. Note he never said that they would be terminated in that email. Never mentioned national origin, never mentioned race. None of that's even an issue in the emails that went back from Bates and Olive to Mr. Peterson. There's simply no evidence that Mr. Peterson's alleged bias led to the final decision to terminate Ms. Sarandon and Ms. Bates' employment. I'm sorry, Ms. Brock. I also wanted to make a small clarification as far as the nature of the facility. It is a hospital. However, there's a small portion of the facility that deals with assisted living. So there are people that are living there on a regular basis. So that was a part of the consideration in this matter. As far as the rule about no sleeping on duty, there absolutely is a rule. It's in the standards of conduct policy that says no sleeping on duty is allowed. But what's that mean to be on duty? They were on break. I don't mean to mince words, but opposing counsel's point is they're on break. That's correct, Your Honor. However, there appears to be different definitions of what constitutes on duty. The policy itself doesn't define it. And so Diane Bates, the HR business partner, testified to her understanding, and so did Pete Peterson. Pete Peterson's was if they're on the clock, which they are, even if they're on a break, they're considered on duty. Diane Bates said, yes, if they're on the job, they're on duty because they're expected to potentially be called back to work on the emergency room. And this is important because these particular employees were cleaning critical areas. One of them was cleaning the pre- and post-op areas. The other one was cleaning the actual operative areas. In those circumstances, there may be a very likely scenario where their help would be needed immediately to come over and start doing their job. So ultimately, Your Honor, this is not a wage. In our case, if our interpretation was somehow incorrect, that doesn't mean it wasn't reasonable. And if they had issue with whether or not they should have been paid, they had another avenue to pursue. But the key inquiry here is, is the employer's belief of their proper reason for justification honest? And it's, in fact, very reasonable in light of what they had witnessed that night. I also wanted to touch briefly on the different prima facie cases that have been advanced here, in the event that the Court wants to consider the McDonnell-Douglas analysis. We had a dispute down at the district court level about whether or not the final element of the prima facie case should be replacements. I'm sorry, that the two appellants were replaced by people outside of their protected class versus the similarly situated prom. And we've cited to a number of cases in which the Ninth Circuit used a similarly situated analysis, which is what we urge. That's wrong, though, isn't it? I mean, if you look at McDonnell-Douglas itself and the other Supreme Court cases, they cite this as a way in which a person may establish a prima facie case, not that they must establish it that way. We have other cases that are more consistent with McDonnell-Douglas. But you're right that there are some Ninth Circuit cases that say that. There are also some Ninth Circuit cases that say something else. But it seems to me that Cornwell and those other ones are just flat out wrong. Respectfully, I disagree, Your Honor. And here's why. The others, Mr. Shagelbaum has cited to two different cases by the United States Supreme Court. One of them was Reeves, which was an age discrimination case. The other one was St. Mary's. Starting with Reeves. But start with McDonnell-Douglas. It just says, you know, you have this burden-shifting analysis, and one way that it may be used is thus and such may be used, and we turn may into must. I mean, I know it's what it says, but if you just look at McDonnell-Douglas, it's just been misapplied. And isn't it usually showing that you're replaced by someone of like a Caucasian replacement for someone who is a member of a protected class? You just have to show that? I don't believe that's the case, Your Honor. Here's why. McDonnell-Douglas was actually a failure-to-promote case, and in McDonnell-Douglas it makes perfect sense that they were replaced by someone. Did I just misspeak? I believe that's right. It made sense in the context of McDonnell-Douglas, and I don't believe that McDonnell-Douglas established any stringent framework about what the precise test is. In fact, my understanding is that it said the test that you have to use is the one that has to make sense for the particular circumstances. Right, which is exactly so here too. It seems to me that you can make out a prima facie case in a number of different ways, and you don't always have to show what Cornwell says you have to show. And how in the world are these women to be able to show non-Filipinos who were not fired for sleeping on the job? I mean, isn't that too onerous a burden? Actually, it's not, Your Honor, because they alleged in their depositions that two Hispanic employees, Alvaro Cano and Felipe Martinez, had been caught sleeping but not discharged. So Mr. Peterson, when questioned about that in his deposition, he denied it. One of the employees denied it as well. The other employee had left right now, so we weren't able to track him down. But the appellants tried to establish that through hearsay evidence. They just never got to the point where they were able to prove it through admissible evidence, but they certainly made allegations. And now, as far as what test makes sense, I would submit that in Ms. Aranda's case, the replacement test doesn't make sense because she was not replaced until November of 2008. That's about 17 months after her June 13 termination and was replaced by a completely different supervisor. So how does this new supervisor's decision to replace her with someone else somehow create discriminatory bias? Well, it doesn't, but that's the whole point of why Cornwell doesn't make any sense. It seems to me that the evidence of Mr. Peterson's comments would be enough to suggest to allow a permissible inference of discrimination, which is all that the prima facie case is designed to do. And so that seems to me a perfectly reasonable alternative route to establish the prima facie case. Then, of course, you have the sleeping on the job rule. Whether it's right or wrong, as you say, it doesn't matter. It's what it is. And then the question is whether there's enough in the case to permit a finding of pretext. And I would follow up on that and say there simply isn't enough in the case to make a finding of pretext because one has to look at all the circumstances. Pete Peterson, he's testified to being a martial artist, to revering Asian people, to having Asian friends. He has testified... Well, that doesn't really matter. We have to take as true that he doesn't like Filipinos. He might like Japanese or Koreans, but he doesn't like Filipinos, and so we have to take that as a given. But, okay, Your Honor, but that doesn't reconcile with the facts, which have not been disputed to date, that he hired a Filipino in 2006. Then he gave Ms. Brock, a Filipino, a good performance review in November of 2006. Then he terminated the two appellants because he believed he found them sleeping on duty and based on prior reports. Then he hired two more Filipinos. At Renown, at his subsequent place of employment, he supervised six Filipinos, two of whom he actually hired. But he said he hated, at least the allegation, and this is what we're dealing with at this stage, that he hated Filipinos shortly before he terminated these two plaintiffs, correct? That's correct, Your Honor, allegedly, which he denies, but be that as it may, the inquiry still there remains were those comments made in the context of making an employment decision, or were they stray remarks? Sure, the time proximity is shortly before the terminations. However, one cannot ignore the fact of what everything else occurred surrounding those alleged comments. But doesn't the timing of the comments have an impact on whether they're stray remarks? It certainly does to the extent that if they were remote in time, there would be less of a connection. If this were six months earlier, then it would be easier to believe that. That's true. I'd point out, Your Honor, that plaintiffs have, I'm sorry, the appellants have admitted that there have been no other derogatory remarks. So one has to believe that he hated Filipinos all along, didn't say anything, and then he said that he hates Filipinos the night before. He just chose a bad time to make the statement. And then why did he not follow that up with the email to Diane Bates and Alan Olive? Even if that comment is taken as true, the fact remains, his email that followed those remarks said, I intended to give them verbal warnings, and nowhere did he suggest that they be terminated at that time. Thank you, counsel. Your time has expired. We will give you a minute for rebuttal, or you have a minute and ten seconds. Thank you, Mr. President. I think it's pretty clear that Mr. Peterson was involved in the process by their own testimony, and also you have to look at the fact that this was not just where he saw them, but he had come back that night basically to try to catch them. So if you put that kind of a motive into him, trying to catch them, this whole process going, and saying in the email which basically told the boss you should fire him, I think it's pretty clear that, and even if he had just gotten the verbal warning, that would be illegal based on this conduct. So, I mean, that would have been a protective Title VII case. Thank you, counsel. The case just argued is submitted. We appreciate the arguments of both of you.
judges: Tunheim, Graber, Christen